J-S05041-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DAHMIR DARNELL HAMMOND | : | |
| | : | |
| Appellant | : | No. 1534 EDA 2024 |

Appeal from the Judgment of Sentence Entered May 13, 2024
In the Court of Common Pleas of Delaware County Criminal Division at
No(s): CP-23-CR-0005181-2022

BEFORE: PANELLA, P.J.E., KING, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY FORD ELLIOTT, P.J.E.: **FILED JULY 27, 2026**

Appellant, Dahmir Darnell Hammond, appeals from the judgment of sentence imposed by the Court of Common Pleas of Delaware County after a jury found him guilty of first-degree murder, attempted murder, aggravated assault, and two counts of firearms not to be carried without a license.[1] Appellant raises four issues on appeal. Upon careful review, we affirm.

The evidence at trial established that, on July 12, 2021, around 9:07 p.m., Police Officer Adam Youssef was dispatched to an apartment building in Chester, Pennsylvania, after report of a shooting. *See* N.T. Trial, 2/27/24, at 60-61. Officer Youssef arrived at the scene with two other officers,

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] *See* 18 Pa.C.S. §§ 2502(a), 901(a)/2502(a), 2702(a)(1), and 6106(a)(1), respectively.

encountering apartment residents screaming and yelling. ***See id.*** at 63. Officer Youssef walked through the front doors of the apartment building, into the lobby, observing broken glass. ***See id.*** at 65-66.

In the lobby was one victim, Najee Cain, lying in a pool of blood in front of an elevator, having sustained fatal gunshot wounds, including one to his head. ***See*** N.T. Trial, 2/27/24. at 65-66, 73, 115. Apartment residents directed Officer Youssef to the back ramp of the building, where he located a second victim, Yameer McCommons, who was conscious and speaking but had suffered multiple gunshot wounds. ***See id.*** at 66-67, 73-76. After identifying both victims, and ensuring emergency medical services were in route, Officer Youssef conducted crowd control. ***See id.*** at 68-69; ***see also*** Commonwealth Exhibit C-2 (Crime Scene Report).

Afterwards, Doctor Albert Chu, the Delaware County Chief Medical Examiner testified regarding Cain's autopsy. ***See*** N.T. Trial, 2/27/24, at 82-120; ***see also*** Commonwealth Exhibit C-56 (Chu Autopsy Report).[2] Dr. Chu testified that Cain sustained ten gunshot wounds, including a perforating gunshot wound to the head. ***See*** N.T. Trial, 2/27/24, at 110 (stating head wound caused multiple skull fractures and penetrated the brain, rendering Cain immediately unconscious and incapacitated). Two additional gunshot wounds struck the femoral arteries and veins in Cain's thighs. ***See id.*** at 110-

---

[2] Dr. Bennett Preston performed the autopsy but was unable to appear at trial due to a family emergency. ***See*** N.T. Trial, 2/27/24, at 83-84; Commonwealth Exhibit C-4 (Dr. Preston Autopsy Report).

11. Dr. Chu ultimately determined that Cain died from multiple gunshot wounds and classified the manner of death as homicide. *See id.* at 115.

Farrah Potts, Cain's girlfriend, testified that Cain lived with her in the apartment building where he was shot. *See* N.T. Trial, 2/27/24, at 132-33. She added that McCommons was her cousin and frequently visited the apartment building. *See id.* at 134-36. Potts testified that, on July 12, 2021, both Cain and McCommons were coming and going from her apartment throughout the day. *See id.* at 136-38. At approximately 9:00 p.m., while Potts was in the kitchen, Cain either received a telephone call or text message and then left the apartment with McCommons, telling Potts that he would be right back. *See id.* Two minutes later, Potts heard two separate rounds of gunshots, which sounded different from one another and were separated by a brief pause. *See id.* at 138-39.

Thereafter, Potts heard screaming, looked outside, and observed McCommons lying on the apartment building's rear exterior ramp yelling that he had been shot. *See* N.T. Trial, 2/27/24, at 139-40. Potts went downstairs and discovered Cain's body lying on the lobby floor. *See id.* at 140, 149-51. Potts further testified that, before leaving the apartment that evening, Cain possessed a firearm secured to a holster on the left side of his body. *See id.* at 141-42, 174-75. The Commonwealth later introduced evidence establishing that Cain had applied to purchase a Kahr CW45, .45-caliber handgun on May 12, 2021, and that the firearm was recovered in Wilmington, Delaware, on July 20, 2022. *See* N.T. Trial, 2/28/24, at 303-04. At trial, Potts identified the

recovered firearm as the same firearm Cain possessed before his death. **See** N.T. Trial, 2/27/24, at 174-75.

Potts also testified that, on July 14, 2021, she identified Appellant for the police from a still image taken from the video surveillance footage depicting an individual inside the apartment building before the shooting. **See** N.T. Trial, 2/27/24, at 155-58; **see also** Commonwealth Exhibits C-8 (Appellant Still Image) and C-30 (Camera Twelve Footage). She explained that she recognized Appellant because she had seen him in the apartment building nearly every day since moving there in February 2021. **See** N.T. Trial, 2/27/24, at 159. Although Appellant did not reside in the building, he was associated with individuals that lived across from her apartment. **See id.** at 161.

Additionally, Potts recounted that, on the day before the shooting, Cain was involved in a verbal altercation with one of the individuals who frequented the apartment, though Appellant was not involved in the dispute. **See** N.T. Trial, 2/27/24, at 165-67, 172-73. Finally, Potts explained that she witnessed Appellant, Cain, and McCommons involved in an argument in which McCommons brought out his firearm about one month before the shooting. **See id.** at 176-79. On cross-examination, Potts confirmed that she did not see Appellant on the day of the incident. **See id.** at 182. She also acknowledged that Cain was selling Percocets in the apartment building. **See id.** at 186-87.

Darryl Davis testified that on the day of the incident, he observed Appellant in the lobby of the apartment building at approximately 9:00 p.m. and later identified Appellant to police in a photographic array and a still photograph culled from the apartment building's surveillance footage. **See** N.T. Trial, 2/27/24, at 204-17; Commonwealth Exhibit C-12 (Appellant Still Image 2). Layota Davis and Derrin Johnson testified that they heard multiple rounds of gunfire, separated by a brief pause, on the evening of July 12, 2021, before discovering Cain's body in the apartment building lobby. **See** N.T. Trial, 2/28/24, at 7-13, 20-30. Johnson confirmed that he did not observe Cain's firearm on or near his body. **See id.** at 29. Additionally, Johnson testified that, later that evening, police showed him a photographic array and asked him if he recognized anyone from the building. **See** N.T. Trial, 2/28/24, at 36-37. He identified Appellant in the array and identified him during his trial testimony, stating that Appellant was also known as "Mir." **See id.** at 37-38.

McCommons, the surviving victim, testified that he and Cain had been close friends for their entire lives and were with each other nearly every day. **See** N.T. Trial, 2/28/24, at 41-42. At the time of the shooting, McCommons was residing with his girlfriend at the apartment building. **See id.** at 43. On the evening of July 12, 2021, he went to his apartment to meet Cain, the decedent, and asked him for ride elsewhere. **See id.** at 43-45.

According to McCommons, he and Cain rode down the elevator to the first floor together. **See** N.T. Trial, 2/28/24, at 45-46. As they exited, gunfire erupted from the left side. **See id.** at 46. McCommons stated that he tried to

escape through the apartment building's back door and, while attempting to run, his legs collapsed beneath him, and he fell onto the exterior ramp. *See id.* at 47. He testified that another individual then came through the back door, fired more shots, and retreated inside the building. *See id.* McCommons maintained that only one shooter was involved and that he sustained eighteen gunshot wounds during the incident. *See id.* at 51.

McCommons declined to identify Appellant as the shooter during his trial testimony. *See* N.T. Trial, 2/28/24, at 49. Further, he testified that detectives initially attempted to speak to him after the shooting, but he told them to leave because there was "nothing to talk about." *Id.* at 51-52. He asserted that he did not recall speaking with Tunisia Patterson while he was hospitalized. *See id.* at 53. Moreover, at the preliminary hearing, McCommons testified that the shooting happened suddenly and he had little opportunity to observe the shooter. *See id.* at 76-78.

McCommons acknowledged, however, that he identified Appellant as the shooter during a police interview conducted on May 10, 2022, after the police arrested him in connection with an unrelated matter. *See* N.T. Trial, 2/28/24, at 54-56; Commonwealth Exhibits C-24 (Police Interview Video) & C-25 (Police Interview Transcript). During the interview, McCommons told Detective Raheem Blanden that "it's one dude, [Appellant]," and he selected Appellant from both a still photograph and photographic array. *See id.* at 55. However, on February 3, 2024, McCommons provided a signed affidavit to a defense investigator affirming that Appellant "did not shoot [him] on the date

of July 2, 2021." Commonwealth Exhibit C-52 (McCommons Affidavit); ***see also*** N.T. Trial, 2/28/24, at 81-87. At trial, McCommons claimed that he did not know who shot him, could not describe the shooter's appearance, and did not know what he was wearing. ***See id.*** at 95-96. He additionally acknowledged that he had been taken into custody on a material witness warrant to secure his testimony at both the preliminary hearing and trial. ***See id.*** at 62-64, 91-96.

On cross-examination, McCommons testified that he was certain Appellant did not shoot him. ***See*** N.T. Trial, 2/28/24, at 100. Moreover, when McCommons gave his May 10, 2022 statement to the police, he had not yet been arraigned or given bail and remained in custody for approximately five hours while being questioned on three separate occasions. ***See id.*** at 100, 103-06, 145-47. McCommons testified that the detective became frustrated with his refusal to identify Appellant and offered to help with his unrelated case in exchange for information. ***See id.*** at 104-05, 119. During the first two interviews, McCommons repeatedly denied that Appellant was the shooter and stated there were multiple shooters. ***See id***. at 106, 108, 113. During a third interview, after police showed him photographs posted on social media, McCommons identified Appellant as the shooter. ***See id.*** at 127.

Tunisia Patterson, Cains' sister, testified that she participated in a video chat with McCommons while he was hospitalized following the shooting. ***See*** N.T. Trial, 2/28/24, at 150-52. At approximately 3:00 p.m., Patterson asked McCommons' mother to call her from his hospital room via FaceTime to find

out what had happened. ***See id.*** at 152-53. She stated that McCommons was intubated and had medical equipment around his mouth, neck, and throat. ***See id.*** at 153-54. Patterson explained that when asked who injured him, McCommons mouthed the word "Mir", Appellant's nickname, to her over Facetime. ***See id.*** at 154. Then, Appellant's counsel made a hearsay objection, which the trial court overruled and admitted the statement as a prior inconsistent statement. ***See id.*** at 154-55. Patterson added that she took one screenshot memorializing the video chat, as well as two additional screenshots during the call depicting McCommons. ***See id.*** at 157.

Afterwards, Officer Michael Smalarz testified that, after an arrest warrant had been issued, he encountered Appellant during a June 18, 2022 vehicle stop. ***See*** N.T. Trial, 2/28/24, at 168-71.[3] During the encounter, Appellant provided the officer with a false name and date of birth. ***See id.*** at 171-73. Officer Smalarz took Appellant back to his police station and, upon using a fingerprint scanner, discovered his real name and the arrest warrant. ***See id.*** at 173.

Detective Louis Grandizio, an expert in firearms and toolmark identification, testified that he examined various pieces of evidence. ***See*** N.T. Trial, 2/28/24, at 177-232; Commonwealth Exhibit C-38 (Grandizio Ballistic Report). He stated that twenty-one fire cartridges were found at the crime

---

[3] An arrest warrant for Appellant was approved on August 16, 2021. ***See*** N.T. Trial, 2/28/24, at 294-98.

scene. **See** N.T. Trial, 2/28/24, at 185. Further, Detective Grandizio determined that all the .45-caliber cartridges from the scene had been fired from Cain's semiautomatic .45-caliber pistol. **See id.** at 190-93. Moreover, he examined fifteen 9mm fired cartridge casings recovered from the scene and determined they had been fired from a single, unknown firearm. **See id.** at 193-95.

During direct examination, Detective Grandizio testified regarding a brief portion of the surveillance video recovered after the shooting. **See** N.T. Trial, 2/28/24, at 205-26. The footage was captured from the rear of the apartment building, near where McCommons was found after the shooting, and faced the adjoining stairwell. **See id.** at 264-65; **see also** Commonwealth Exhibit C-30 (Camera Nine Footage). Defense counsel objected to Detective Grandizio's ability to testify to whether the appearance of the firearm's slide suggested that the gun in Appellant's hand had expended all its loaded ammunition. and argued that the Grandizio's testimony was not included in his expert report. **See** N.T. Trial, 2/28/24, at 222 (arguing Detective Grandizio's testimony was not included in expert report). The trial court overruled the objection and cautioned Detective Grandizio that he could only offer an opinion if the firearm was clearly visible in the footage. **See id.** at 223-25.

Timothy Deery, a police detective for Delaware County, identified the video surveillance footage recovered from the cameras inside the apartment building. **See** N.T. Trial, 2/28/24, at 233-311. Detective Derry testified that,

after 9:30 p.m., he arrived at the apartment building, and the victims had already been transported to the hospital. *See id.* at 239-42. He stated there was six points of entry into the lobby of the apartment building on the day of the shooting, and he located all available video surveillance footage covering these entry points. *See id.* 251-64. He explained that, although no camera captured the lobby itself, he tracked the path of each observed person by switching between the various cameras. *See id.* at 262-65; Commonwealth Exhibit C-32 (Surveillance Footage Compilation).

Moreover, Detective Deery testified that the footage showed Appellant entering the building through a side exterior door before the shooting and he was not seen again until he ran out of the front door after the shooting. *See* N.T. Trial, 2/28/24, at 266-67. He described Appellant in the footage as "wearing a gray hoodie with white piping down the middle, distressed jeans [], and black [high] top sneakers with white soles." *Id.* at 266. The footage showed Cain and McCommons entering the elevator on the fifth floor at approximately 9:05 p.m. *See id.* at 273-74. Detective Deery explained that the individual in the video, Appellant, was the only person observed in the lobby area during the period. *See id.* at 274-75. Further, the footage showed Appellant reentering the building through the back door, quickly exiting through the front door, and fleeing across the building's parking lot at 9:06 p.m. *See id.* at 277-79, 307-08.

With respect to the firearm charges, the Commonwealth introduced a certificate of non-licensure from the Pennsylvania State Police establishing

that Appellant did not have a valid license to carry a firearm. **See** N.T. Trial, 2/28/24, at 338. Appellant did not testify but called his mother, Tammy Robinson, as a character witness who testified to his reputation for being a peaceful and law-abiding person. **See id.** at 340-47. After closing arguments, the jury found Appellant guilty of first-degree murder for Cain's death, attempted murder and aggravated assault oft McCommons, and two counts of firearms not to be carried without a license. **See** Verdict, 2/28/24, at 1-2.

On May 13, 2024, the trial court sentenced Appellant to life imprisonment without the possibility of parole for the murder conviction, a consecutive sentence of seven-and-one half to twenty years' imprisonment for attempted murder, and a consecutive sentence of one to two years' imprisonment for each of the firearm convictions. **See** Certificate of Imposition of Sentence, 5/13/24 (stating aggravated assault merged with attempted murder for sentencing purposes); N.T. Sentencing Hearing, 5/13/24, at 10-11. Appellant filed a post-sentence motion where he challenged the weight and sufficiency of the evidence sustaining his convictions, which the trial court denied on June 10, 2024. **See** Post-Sentence Motion, 5/13/24; Order (denying post-sentence motion), 6/10/24. Appellant filed a timely notice of appeal, and he and the trial court complied with Pennsylvania Rule of Appellate Procedure 1925. **See** Notice of Appeal 5/13/24; Rule 1925(b) Order, 7/18/24; Rule 1925(b) Statement, 8/8/24; Trial Court Opinion, 6/24/25.

Appellant raises the following issues for our review:

I. Whether the evidence was sufficient to support the convictions of first[-]degree murder of Najee Cain, the attempted murder of Yameer [Mc]Commons, and firearms not to be carried without a license?

II. Whether the direct examination of Commonwealth expert witness [Detective] Louis Grandizio regarding the condition of the handgun seen in the video was lawful, where the subject of the condition of the handgun was not contained in the expert witness' report?

III. Whether a pre-trial statement made by Yameer McCommons wherein McCommons uttered Appellant's name, testified by Tunisia Patterson, was inadmissible hearsay?

IV. Whether the Appellant was denied his right to a fair trial and to due process of law, as guaranteed by the Fourth, Sixth[,] and Fourteenth Amendments to the United States Constitution and Article [I,] Section 9 of the Pennsylvania Constitution, based on the Commonwealth's closing argument that witness Yameer McCommons lied, argument that was improper and prejudicial to [] Appellant[?]

Appellant's Brief at 4 (unnecessary capitalization omitted and brackets added).

In issue one, Appellant argues that his first-degree murder, attempted murder, and firearms not to be carried without a license convictions are based upon insufficient evidence. *See* Appellant's Brief at 19-22.

We begin by noting our standard of review for sufficiency of evidence:

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be

- 12 -

resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact[,] while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part[,] or none of the evidence.

*Commonwealth v. Gause*, 164 A.3d 532, 540-41 (Pa. Super. 2017) (*en banc*) (citation omitted).

As an initial matter, we must address the Commonwealth's contention that Appellant failed to preserve his sufficiency claim for appellate review in his Rule 1925(b) statement because he did not specify which elements of his offenses he alleges went unproven at trial. *See* Appellee's Brief at 24-25. It is well-settled that our Court has held that to properly preserve a sufficiency claim for review on appeal in a Rule 1925(b) statement, the appellant must specify the elements upon which the evidence was insufficient or the basis for the sufficiency claim. *See Commonwealth v. McFarland*, 278 A.3d 369, 381 (Pa. Super. 2022) (citation omitted) (finding waiver where McFarland's sufficiency claim included in his Rule 1925(b) statement only asserted "There was insufficient evidence to convict the Defendant in this case."). "Such specificity is of particularly importance in cases where, as here, the appellant was convicted of multiple crimes each of which contains numerous elements that the Commonwealth must prove beyond reasonable doubt." *Commonwealth v. Garland*, 63 A.3d 339, 344 (Pa. Super. 2013). If the

appellant does not specify such elements, the sufficiency claim is deemed waived. **See Commonwealth v. Roche**, 153 A.3d 1063, 1072 (Pa. Super. 2017); **see also Commonwealth v. Schofield**, 312 A.3d 921, 927 (Pa. Super. 2024) (stating our Court may waive sufficiency claim "even where trial court issued an opinion addressing substance of claim.").

Here, Appellant in his court-ordered Rule 1925(b) statement, challenged several of his convictions but did not specify the element or elements the Commonwealth allegedly failed to prove beyond a reasonable doubt or even present a theory as to why the evidence was sufficient to sustain the convictions. **See** 1925(b) Statement, 8/8/24, at 1 ("Whether the evidence was sufficient to support the convictions of first[-]degree murder of Najee Cain, the attempted murder of Yameer McCommons, firearms not to be carried without a license and persons not to possess, etc., firearms?") (unnecessary capitalizations omitted). If Appellant merely wished to allege that he wanted to challenge the sufficiency of the evidence proving his identity as the shooter in this case, he should have alleged as much in his Rule 1925(b) statement, rather than include an undefined assertion of insufficient evidence. Further, on appeal, Appellant cites neither governing statutory provisions nor relevant case law pertaining to the elements of the offenses for which he challenges on appeal. **See** Appellant's Brief at 20-22. Accordingly, we conclude that

Appellant has waived his sufficiency of evidence claim for lack of specificity. *See Roche*, 153 A.3d at 1072.[4]

In his second issue, Appellant contends that the trial court erred in allowing the Commonwealth's ballistics expert, Detective Grandizio, to testify

---

[4] Even assuming Appellant's sufficiency of evidence claim has not been waived, we find it is meritless. Appellant's argument emphasizes that, "[i]n light of McCommons' testimony under oath that Appellant was not involved, and the coercive circumstances leading to his final statement implicating Appellant, a conviction based on this evidence is speculative." Appellant's Brief at 20-21. Appellant also challenges the surveillance footage, asserting it did not capture the shooting, came from an unreliable camera system, and showed only a person wearing clothing similar to Appellant's. *See id.* at 21 ("The footage shown to the jury was culled together from a surveillance system that was 'in disarray.'"). He further contends the Commonwealth's evidence and witness testimony failed to establish motive or show how Appellant knew when the victims would leave the elevator. *See id.* Lastly, he asserts that "the facts and circumstances [in this case] are so weak and inconclusive that, as a matter of law, no probability of fact may be drawn from the combined circumstances." *Id.* at 21-22 (citing *Commonwealth v. Roberts*, 293 A.3d 1221, 1223 (Pa. Super. 2023)).

In essence, Appellant conflates weight and sufficiency, because analysis of the sufficiency of evidence does not include an assessment of credibility of testimony offered by the Commonwealth. *See Commonwealth v. Widmer*, 744 A.2d 745, 751-53 (Pa. 2000) (explaining distinctions between claim challenging sufficiency of evidence and claim challenging weight of evidence); *Commonwealth v. Juray*, 275 A.3d 1037, 1043 (Pa. Super. 2022) (stating credibility arguments "are more properly characterized as challenges to the weight of evidence."). Moreover, Appellant's argument does not properly address our standard of review, as it does not assess whether the evidence presented, in the light most favorable to the Commonwealth, adequately proved the elements of the convictions and whether they were committed by Appellant. Upon our review of the record, we agree that, upon the applicable standard of review, the evidence presented to the jury would have been sufficient to sustain Appellant's convictions. *See* Trial Court Opinion, 6/24/25, at 5-7. Accordingly, we would find Appellant's first issue meritless.

as to the condition of the handgun seen in the video footage where that opinion was undisclosed in the expert report. ***See*** Appellant's Brief at 22-26.

Pennsylvania Rule of Criminal Procedure 573 which governs pre-trial discovery states, in relevant part, as follows:

### (B) Disclosure by the Commonwealth

(1) *Mandatory*. In all court cases, on request by the defendant, and subject to any protective order which the Commonwealth might obtain under this rule, the Commonwealth shall disclose to the defendant's attorney all of the following requested items or information, provided they are material to the instant case. The Commonwealth shall, when applicable, permit the defendant's attorney to inspect and copy or photograph such items.

…

(e) any results or reports of scientific tests, expert opinions, and written or recorded reports of polygraph examinations or other physical or mental examinations of the defendant that are within the possession or control of the attorney for the Commonwealth[.]

Pa.R.Crim.P. 573.

The admission of expert testimony is a matter of discretion for the trial court, and will not be disturbed absent an abuse of discretion. ***Commonwealth v. Walker***, 92 A.3d 766, 772 (Pa. 2014). An abuse of discretion "is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused." ***Id.*** at 772–73 (citation omitted).

Expert testimony is admissible in all cases, civil and criminal alike, "when it involves explanations and inferences not within the range of ordinary training knowledge, intelligence and experience." ***Id.*** at 788 (quoting ***Commonwealth v. Leslie***, 227 A.2d 900, 903 ([Pa.] 1967)). Even where an expert's testimony arguably went

beyond the scope of his or her report, the defendant still bears the burden of proving he suffered prejudice from the admission of the testimony. ***See Commonwealth v. Henry***, 706 A.2d 313, 326–27 ([Pa.] 1997). The trial court has broad discretion in choosing the appropriate remedy for a discovery violation. ***See Commonwealth v. Jones***, 688 A.2d 491, 512 ([Pa.] 1995).

***Commonwealth v. Poplawski***, 130 A.3d 697, 718 (Pa. 2015) (parallel citations omitted).

Specifically, Appellant points to Detective Grandizio's testimony that the handgun's slide was locked in the rear position indicating that the firearm was empty of ammunition. ***See*** Appellant's Brief at 22. Defense counsel objected on the ground that this opinion was not contained in Grandizio's expert report. ***See id.*** (citing N.T. Trial, 2/28/24, 205). Following a sidebar discussion, the trial court overruled the objection, "observ[ing] that facts in evidence would support the opinion." ***Id.*** (citing N.T. Trial, 2/28/24, at 222). Thereafter, Grandizio testified that, with a semiautomatic handgun, a slide pulled fully to the rear signifies that the magazine is empty, and he opined that the firearm shown in the surveillance footage appeared to be in that condition. ***See id.*** at 22-23 (citing N.T. Trial, 2/28/24, at 224).

Appellant contends that this testimony exceeded the permissible scope of expert testimony because the opinion regarding the firearm's condition was never disclosed in Grandizio's report. ***See*** Appellant's Brief at 24. Relying on ***Commonwealth v. Roles***, 116 A.3d 122 (Pa. Super. 2015), and ***Commonwealth v. Williams***, 241 A.3d 1094 (Pa. Super. 2020), Appellant asserts that, although there are no rules of procedure in criminal cases precisely governing the scope of expert trial testimony, neither party has *carte*

*blanche* to allow an expert to testify beyond the contents of the expert report, as doing so undermines Pennsylvania's disclosure requirements. ***See id.***

He emphasizes Grandizio's report merely identified the items examined and concluded that the nine-millimeter casings were fired from the same firearm and that the .45-caliber casings were fired from the same firearm. ***See*** Appellant's Brief at 25. Appellant contends he is "prejudiced, as the conclusion that the jury could reach from the disputed testimony, and the conclusion that the Commonwealth sought, was that the shooter emptied the handgun inside the lobby during the assault on [Cain], then retrieved [Cain's] handgun to continue the assault on McCommons." ***Id.*** Therefore, since the trial court erred in admitting the expert testimony of Detective Grandizio, this caused Appellant prejudice and he is entitled to a new trial. ***See id.*** at 26. We disagree.

As the trial court explained, Detective Grandizio was asked to review the surveillance footage and offer an opinion regarding the firearm's appearance, and this supported the Commonwealth's theory that Appellant took Cain's firearm to continue shooting him. ***See*** Trial Court Opinion, 6/24/25, at 5. Although the report did not expressly reference the slide position, the Commonwealth's evidence[5] and Grandizio's disclosed report concerned the

_____

[5] Before Detective Grandizio testified, the Commonwealth provided evidence that Cain was armed with .45-caliber firearm moments before the shooting, however, no firearm was recovered from his body. ***See*** N.T. Trial, 2/27/24, at 141-42, 174-75.

- 18 -

caliber of ammunition recovered, the number of shots fired, and the absence of a recovered firearm. *See* N.T. Trial, 2/28/24, at 184-89; Commonwealth Exhibit C-38. Thus, the challenged testimony was not an entirely new theory, but rather an interpretation drawn from evidence already admitted in the case.

Moreover, the trial court reasonably concluded that Appellant failed to demonstrate prejudice. *See* Trial Court Opinion, 6/24/25, at 6. Defense counsel was aware of the surveillance footage prior to trial, objected contemporaneously to the testimony, and fully cross-examined Detective Grandizio regarding his interpretation of the video footage and the basis of his opinion. *See* N.T. Trial, 2/28/24, at 205, 221-22, 227-29. The record therefore supports the trial court's determination that the defense had a meaningful opportunity to challenge the testimony and was not unfairly surprised by the opinion offered at trial about the position of the pistol slide seen in the admitted surveillance footage. *See Poplawski*, 130 A.3d at 718. Because the opinion was grounded in Grandizio's firearm expertise and supported by facts already admitted into the evidence, the trial court did not abuse its discretion in permitting the testimony. Accordingly, Appellant's second issue is meritless.

In the third issue, Appellant challenges the admission of Tunisia Patterson's testimony of McCommons mouthing the word "Mir," in a FaceTime call as an identification of the shooter. *See* Appellant's Brief at 26-31. The trial court admitted the reference as a prior inconsistent statement under Pa.R.E. 803.1(1), which Appellant contends is inadmissible hearsay. *See id.*

> The admissibility of evidence is a matter within the sound discretion of the trial court and will be reversed only where there is a clear abuse of discretion. Our standard of review of a challenge to an evidentiary ruling is therefore limited. Abuse of discretion is not merely an error of judgment, but rather where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will.

**Williams**, 241 A.3d at 1101 (citation omitted).

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted and is inadmissible unless an exception applies. **See** Pa.R.E. 801(c); Pa.R.E. 802. Under Pa.R.E. 803.1(1), certain prior inconsistent statements of a declarant-witness are admissible for their truth if the declarant testifies at trial and is subject to cross-examination about the prior statement. These include a prior inconsistent statement that: "(A) was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition; (B) is a writing signed and adopted by the declarant; or (C) is a verbatim contemporaneous electronic recording of an oral statement." Pa.R.E. 803.1(1)(A)–(C).

On the other hand, Rule 613 governs the prior inconsistent statements for impeachment purposes. Under Rule 613, a party is permitted to introduce extrinsic evidence of a witness's prior inconsistent statement to impeach a witness's creditability if: "(1) the statement, if written, is shown to, or if not written, its contents are disclosed to, the witness; (2) the witness is given the opportunity to explain or deny the making of the statement; and (3) an adverse party is given an opportunity to question the witness." Pa.R.E. 613(b).

As stated above, Appellant challenges Patterson's testimony that McCommons mouthed the name, "Mir," as an apparent reference to Appellant, when she asked him what happened to him over a FaceTime call. ***See*** Appellant's Brief at 26. Appellant contends that this testimony constituted inadmissible hearsay and was improperly admitted as substantive evidence under Pennsylvania Rule of Evidence 803.1(1). ***See id.*** at 28. He argues that McCommons' statement was not reduced in writing, was not given under an oath at a hearing or deposition, and Patterson did not record the exchange, and thus the hearsay exception at Rule 803.1(1) did not apply. ***See id.*** (citing N.T. Trial, 2/28/24, at 159). Although the Commonwealth admitted screenshots that Patterson took during the exchange, the evidence of McCommons mouthing, "Mir," was not documented in a videotaped or audiotaped recording. ***See id.*** (citing Commonwealth Exhibit C-21 (Hospital Screenshot)). Since the requirements under Rule 803.1 were not met, McCommon's hospital statement is inadmissible for purposes of that rule. ***See id.***

Appellant also avers that Patterson's testimony about McCommon's hospital statement was not subject to the impeachment rule under Rule 613. ***See*** Appellant's Brief at 29. He states the record shows that McCommons was asked but did not recall a conversation with Patterson at the hospital. ***See id.*** (citing N.T. Trial, 2/28/24, at 53). Regardless, Appellant states that Patterson's statement was not utilized for impeachment under Rule 613. ***See***

*id.* Appellant refers to the closing argument and jury instructions as support

for this contention:

> And saying that [McCommons] kn[e]w, he told [Patterson] in the hospital, because again, she came up here [on] the stand and she goes, he mouthed the words. And if she wanted to put something on this guy, that guy. Again, put something on him but not knowing he's the real killer. So letting the killer of [Cain] run free to put something on some other guy that no relation between them. [sic] Now, thinking she could have said, [Appellant] did it, [Appellant] hadn't near me? He said it over and over, she said, and she was clear about that. She said he mapped the words. And to me it looked like [McCommons] said near, near, straightforward. She -- and you can see that the screenshot of the call, it happened. What are you talking about, we don't have evidence of it. What are talking about? We have the -- she has a screenshot from that call. This happened. That conversation happened. He told her that.

Appellant's Brief at 29-30 (quoting N.T. Trial, 2/29/24, at 70-71).

> Now you heard evidence that a witness Yameer McCommons made a statement on an earlier occasion that was inconsistent with his present [c]ourt testimony. You may[,] if you choose, regard this evidence as proof of the truth of anything the witness said in the earlier statement. You may also consider this evidence to help you [j]udge the credibility and weight of the testimony given by the witness on the stand when he testified.

*Id.* at 40 (quoting N.T. Trial, 2/29/24, at 96).[6]

_____

[6] We note that Appellant did not object to the quoted portion of the prosecutor's closing statement or the jury instructions. *See* N.T. Trial, 2/27/24, at 72, 117. Therefore, Appellant has waived his argument concerning the portions of the closing statement and jury instructions because he did not bring them before the trial court. *See* Pa.R.Crim.P. 647(C) ("No portions of the charge nor omissions from the charge may be assigned as error unless specific objections are made thereto before the jury retires to deliberate."); Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal.").

Appellant states that, admittedly, McCommons made a statement to police that would meet the requirements of Rule 803.1. *See* Appellant's Brief at 30. However, he claims "the instruction given to the jury does not differentiate between the recorded statement McCommons gave to police and the FaceTime exchange in the hospital room." *Id.* Therefore, the jury could have concluded that the hospital exchange could be substantive evidence because it does not meet the requirements of 803.1 and is inadmissible. *See id.* at 30-31.

While the trial court determined that Patterson's testimony satisfied the requirements of the hearsay exception under Rule 803.1(1), and the Commonwealth stated that use of the testimony was proper for impeachment under Rule 613(b), upon review, we find that neither applies to the hospital statement. *See* Trial Court Opinion, 6/24/25, at 6-7; Appellee's Brief at 39-43.[7] We agree with Appellant that the hospital exchange does not satisfy Rule 803.1(1) because McCommons' mouthing of the name, "Mir," was not given, under oath, at a trial, hearing or deposition, recorded in a writing, or document in a verbatim contemporaneous electronic recording. *See* N.T. Trial, 2/28/24, at 153-56; Pa.R.E. 803.1(1)(A)-(C). In particular, the screenshots were not a contemporaneous verbatim recording of McCommon's hospital statement.

---

[7] "[A]s an appellate court, we may affirm on any legal basis supported by the certified record." *Commonwealth v. Ani*, 293 A.3d 704, 729 (Pa. Super. 2023) (quoting *Commonwealth v. Williams*, 125 A.3d 425, 433 n.8 (Pa. Super. 2015)).

*See* Commonwealth Exhibit C-21; ***Commonwealth v. Wilson***, 707 A.2d 1114, 1118 (Pa. 1998) ("[W]hen the prior inconsistent statement is a contemporaneous verbatim recording of a witness's statement, the recording statement must be electronic, audiotaped or videotaped recording in order to be considered substantive evidence."). Additionally, McCommons never admitted telling Patterson that "Mir" did it at trial or when he was being interviewed by the police. ***See*** N.T. Trial, 2/28/24, at 49-53. Therefore, we find the hospital statement is inadmissible under Rule 803.1(1).

Reiterating our above conclusion, we also find that the Commonwealth's argument that the hospital statement was subject to impeachment under 613(b) is unpersuasive. ***See*** Appellee's Brief at 39-43. The Commonwealth contends that, since McCommons stated that he did not recall the hospital exchange on the stand, this fulfills the requirement under Rule 613(b) that "the witness is given the opportunity to explain or deny the making of the statement." ***Id.*** at 39 (citing N.T. Trial, 2/28/24, at 53). However, for impeachment purposes, our Court has held that "[t]here must be evidence that the statement was made or adopted by the witness whose credibility is being impeached." ***Commonwealth v. Brown***, 448 A.2d 1097, 1103 (Pa. Super. 1982). In ***Brown***, a women stated she couldn't recall whether the appellant was wearing glasses or not. ***See id.*** at 1102. Since defense counsel never presented evidence that the women made or adopted a prior statement inconsistent with her trial testimony, this Court found that the trial court properly disallowed the use of the statement. ***See id.*** at 1103.

Upon review of the record, we find that the Commonwealth has not offered any evidence that McCommons made a statement to police or during the trial regarding the hospital statement. Similar to the facts of **Brown**, McCommons did not recall speaking to Patterson. **Compare Brown**, 448 A.2d at 1103 **with** N.T. Trial, 2/28/24, at 49-53. Therefore, we find that the hospital statement was not permissible material for impeachment and the trial court committed error by allowing it to be presented to jury for purposes of Rule 803.1(1).

Though we find error with the trial court's rejection of the defense objection to the hospital statement, that finding does not conclude our review with respect to this issue. It is well-settled that, if a trial court abuses its discretion in issuing an evidentiary ruling, "a verdict can still be sustained if the error was harmless." **Commonwealth v. Yocolano**, 169 A.3d 47, 53 (Pa. Super. 2017) (citation omitted). Further:

> "An error is harmless if it could not have contributed to the verdict, or stated conversely, an error cannot be harmless if there is a reasonable possibility the error might have contributed to the conviction." **Commonwealth v. Poplawski**[,130 A.3d at 716.] Harmless error occurs where:
>
>> (1) the error did not prejudice the defendant or the prejudice was *de minimis*;
>>
>> (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or
>>
>> (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the

>error was so insignificant by comparison that the error could not have contributed to the verdict.

>*Id.* (citation omitted). "The Commonwealth has the burden of proving harmless error beyond a reasonable doubt." *Id.*

*Commonwealth v. Phillips*, 327 A.3d 1236, 1247 (Pa. Super. 2024).

The Commonwealth argues in the alternative that, even if Patterson's testimony about the hospital statement constituted hearsay, any error in its admission was harmless because the jury's verdict rested upon overwhelming evidence of Appellant's guilt. *See* Appellee's Brief at 41-43. In so arguing, the Commonwealth expressly invokes the second and third prongs of the harmless error standard. *See Phillips*, 327 A.3d at 1247. We agree with the Commonwealth.

Our review of the record confirms that Patterson's testimony was merely cumulative of independent evidence overwhelmingly establishing Appellant's identity as the shooter and his consciousness of guilt. Specifically, the Commonwealth introduced surveillance footage accounting for all six points of entry and exit to the apartment building lobby. *See* N.T. Trial, 2/29/24, at 251, 259, 265; Commonwealth Exhibit C-30. The footage further demonstrated Appellant's presence in the building immediately before the shooting and his flight in the immediate aftermath. *See id.* The Commonwealth also introduced still photographs identifying Appellant in the building before and after the shooting. *See* Commonwealth Exhibits C-8 & C-12.

In addition, Potts and Davis testified regarding Appellant's familiarity with the victims, his frequent presence in the building, and escalating tensions between them. *See* N.T. Trial, 2/27/24, at 159-68, 172-73. Furthermore, McCommons identified Appellant as the shooter on May 2022 in a recorded statement to police. *See* Commonwealth Exhibits C-24 & C-25. Although McCommons and defense counsel provided conflicting testimony, the jury was entitled to make their own credibility determination as to Appellant's identity as the shooter. *See Commonwealth v. Talbert*, 129 A.3d 536, 546 (Pa. Super. 2015) ("The jury, as the finder of fact, ha[s] the duty to determine the credibility of the testimony and evidence presented at trial.")

Additionally, the Commonwealth presented testimony from Officer Smalarz demonstrating that Appellant provided false identification to him upon being pulled over, further indicating consciousness of guilt. *See* N.T. Trial, 2/28/24, at 171-73; *Commonwealth v. Calderini*, 611 A.2d 206, 209 (Pa. Super. 1992) (declaring that appellant's act of giving false name and identification when stopped by police is "[a]n additional circumstance tending to show consciousness of guilt."). Therefore, Patterson's testimony was merely cumulative of properly admitted evidence establishing Appellant's identity as the shooter and supported by overwhelming evidence including evidence of consciousness of guilty, thereby rendering the trial court's admission of the hospital statement harmless. *See Phillips*, 237 A.3d at 1247. Accordingly, Appellant's third issue offers no relief.

In the fourth issue, Appellant contends that he was denied a fair trial when the trial court overruled his objection to the Commonwealth's closing argument that McCommons lied. *See* Appellant's Brief at 31-34.

> With specific reference to a claim of prosecutorial misconduct in a closing statement, it is well settled that[,] "[i]n reviewing prosecutorial remarks to determine their prejudicial quality, comments cannot be viewed in isolation but, rather, must be considered in the context in which they were made." ***Commonwealth v. Sampson***, 900 A.2d 887, 890 (Pa. Super. 2006) (citation omitted). Our review of prosecutorial remarks and an allegation of prosecutorial misconduct requires us to evaluate whether a defendant received a fair trial, not a perfect trial. ***Commonwealth v. Rios***, [] 721 A.2d 1049, 1054 ([Pa.] 1998).
>
> ***
>
> It is well[-]settled that a prosecutor has considerable latitude during closing arguments and his arguments are fair if they are supported by the evidence or use inferences that can reasonably be derived from the evidence. Further, prosecutorial misconduct does not take place unless the unavoidable effect of the comments at issue was to prejudice the jurors by forming in their minds a fixed bias and hostility toward the defendant, thus impeding their ability to weigh the evidence objectively and render a true verdict. Prosecutorial misconduct is evaluated under a harmless error standard.

***Commonwealth v. Santiago-Burgos***, 314 A.3d 535, 547-48 (Pa. Super. 2024) (quoting ***Commonwealth v. Holley***, 945 A.2d 241, 250 (Pa. Super. 2008)); *see also **Commonwealth v. Abdul-Ali***, 345 A.3d 759, 782 (Pa. Super. 2025) ("Like the defense, the prosecutor is accorded reasonable latitude and may employ oratorical flair in arguing its version of the case to the jury.") (citation omitted).

Appellant cites to the following portion of the Commonwealth's closing argument:

So [McCommons was] on the stand, all right. He tells us, yes, he remembers getting in the elevator, and going downstairs. He gets out, he hears shots to his left, which is wh[ere the] front door of the lobby is. And then [McCommons] feels himself getting hit and he goes and runs out the back door, crawls the person comes out, shoots him two times. I believe he sat it out in my friend. All right, so Farrah, Potts, and then who did this? And he goes, I know it wasn't him. Okay. And then, and then I asked [McCommons], okay if it wasn't him, tell me what you know about the person that did it. What was their race? Straightforward question. Pretty simple. I don't know. Tell me what is their gender? I don't know. Tell me what their height was. I don't know. Tell me what their weight was. I don't know. You don't know anything, anything. You can't give me one descriptor of the person that did it. From the stand here, you're going to say that he somehow still don't know it wasn't him. That's the most unbelievable and I got to be honest, it's pretty despicable. It's a despicable thing because he is so close with that family and to sit up here and lie like that –

Appellant's Brief at 31-32 (quoting N.T. Trial, 2/29/24, at 67-68).

Appellant contends that the prosecutor improperly attacked Commonwealth witness McCommons' credibility by asserting that he lied about his inability to describe the shooter. **See** Appellant's Brief at 33. According to Appellant, this accusation was not grounded in the evidence but was instead intended to inflame the jury and distract them from the factual record. **See id.** Further, he notes that the prosecutor suggested that McCommons had violated a "sacred duty" to Cain's family, which Appellant contends improperly shifted the jury's focus away from the evidence. **See id.**

Appellant emphasizes that McCommons was the Commonwealth's own witness, not a defense witness, and that the prosecutor's attack stemmed from dissatisfaction with his testimony rather than any defense challenge. *See* Appellant's Brief at 33. As a result, Appellant maintains that the prosecutor's argument was "unduly prejudicial and inflammatory, and allowed the jurors to form in their minds a fixed bias against McCommons' testimony and against [] Appellant." *Id.* at 33. Based on this alleged prosecutorial misconduct, Appellant requests that this Court grant a new trial. *See id.* at 34. We disagree with his alleged entitlement to relief.

Viewed in context, the prosecutor's remarks constituted a permissible comment on McCommons' credibility and the record. *See Sampson*, 900 A.2d at 890. The challenged closing statement was made in direct response to defense counsel's attack on the reliability of McCommons' prior identification and his inability to provide basic identifying characteristics of the shooter. *See* N.T. Trial, 2/29/24, at 22-26, 67-68. Further, the trial court properly instructed the jury that counsel's arguments are not evidence. *See id.* at 6. Because the remarks were grounded in the evidence and reasonable inferences therefrom, they did not amount to prosecutorial misconduct. *See Santiago-Burgos*, 314 A.3d at 547-48. Accordingly, the trial court did not abuse its discretion in overruling Appellant's objection to the Commonwealth's closing argument and Appellant's fourth issue is meritless.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: 7/27/2026